UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 1/31/2023

UNITED STATES,

                    Plaintiff,

          -against-

TURNER,

                    Defendant.

18-cr-00068

<u>ORDER</u>

**ANDREW L. CARTER, United States District Judge:**

On January 25, 2019, Defendant Deshawn Turner ("Defendant") pleaded guilty to being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) and was sentenced to a term of 52 months' imprisonment and three years of supervised release. ECF No. 10. The U.S. Probation Office, as here represented by the Government, now charges that the Defendant has violated the terms of his supervised release. Specifically, Defendant is accused of seven violations of supervised release. On November 21, 2022 and December 14, 2022, the Court conducted an evidentiary hearing (the "Hearing") to determine if the Defendant was guilty of Specifications 1-6 and 8. The Court also received written submissions. Based on the parties' submissions and the evidence presented, including the Court's assessment of the witnesses' credibility, the Court finds that the Government has met its burden as to Specifications 2, 3, 4, 6, and 8, and that the Government has not met its burden as to Specifications 1 and 5.

## BACKGROUND

### I.       Procedural Background

Defendant's term of imprisonment concluded, and his term of supervised release began, on February 25, 2022. On August 28, 2022, the Defendant was arrested by New York City Police Department ("NYPD") officers following a domestic violence incident outside of 210 East 102nd

Street in Manhattan. Defendant was charged with multiple state crimes, including aggravated harassment in the second degree; attempted assault with intent to cause physical injury; and harassment in the second degree.

The Defendant was arrested again on September 27, 2022 following an NYPD investigation of a shooting that took place on September 10, 2022 outside of 210 East 102nd Street. The Government alleges that the Defendant fired multiple shots from a firearm at two individuals on September 10, 2022, outside of 210 East 102nd Street. He was charged by the state with attempted murder; reckless endangerment in the first degree; and criminal possession of a weapon in the fourth degree. He was also charged with criminal possession of a controlled substance in the seventh degree for a suspected oxycodone pill found on his person during his arrest.

In a violation report dated October 5, 2022, the U.S. Probation Office charged the defendant with committing six state crimes, in Specifications 1-6: (1) aggravated harassment in the second degree, in violation of New York Penal Law § 240.30(04); (2) attempted assault with intent to cause physical injury, in violation of New York Penal Law § 110-120.00(01); (3) harassment in the second degree, in violation of New York Penal Law § 240.26(01); (4) attempted murder, in violation of New York Penal Law § 125.25(01); (5) reckless endangerment in the first degree, in violation of New York Penal Law § 120.25; and (6) criminal possession of a weapon in the fourth degree, in violation of New York Penal Law § 265.01(01). Specification 8 charged the defendant with possessing a firearm in violation of his supervised release conditions.[1]

On October 7, 2022, the defendant was presented before U.S. Magistrate Judge Gabriel Gorenstein and was detained based on his danger to the community.  ECF No. 24. On November

---

[1] Specification 7 charged the defendant with criminal possession of a controlled substance in the seventh degree, in violation of New York Penal Law § 220.03. The Government acknowledges that it did not pursue Specification 7 and accordingly the Court finds this specification unproven.

17, 2022, the Government moved *in limine* for the good-cause admission of the out-of-court statements of a witness to the September 10 shooting (hereinafter "Witness-1"). ECF No. 30. The Defendant opposed the Government's motion and separately requested the exclusion of Witness-1's September 27, 2022 statement, on the basis that the identification procedure used by NYPD Officer Loyda Mercado was unduly suggestive. ECF No. 32. Reserving decision on whether Witness-1's hearsay statements ultimately would be admitted into evidence, the Court permitted the Government's witnesses to testify at the Hearing, and the Court allowed the parties to make argument in post-hearing briefing as to the admissibility of the hearsay statements.

## II.   The Evidence

The Court heard live testimony from four NYPD officers and one defense witness, and received into evidence several exhibits, including body-worn camera footage, photographs, surveillance video, and social media posts.

### A. Domestic Violence Incident

### 1.  Testimony of NYPD Officers Ivonne Ramirez, Rafaela Tolentino-Acevedo, and Araliz Martemoya

The Government began the Hearing by calling NYPD Officer Ivonne Ramirez of the 23rd Precinct. Ramirez testified that she was walking to her car outside of the 23rd Precinct to go home at the end of her shift with Officer Rafaela Tolentino Acevedo. ECF No. 34, Transcript of November 21, 2022 Hearing ("Tr. Day 1") 9:14-23; 52:7-9. The Government also called Officer Tolentino of the 23rd Precinct as a witness. Officer Ramirez's car was parked on the east side of Third Avenue between East 101st Street and East 102nd Street, adjacent to the Washington Houses development and, in particular, the Washington Houses building located at 210 East 102nd Street. *Id.* 10:13-13:7. Ramirez testified that when she was next to her car, she heard a loud argument coming from the back of 210 East 102nd Street. *Id.*13:8-22. Ramirez testified that she heard a

woman yelling "No, stop," and saw a man next to her whom she recognized as the Defendant. *Id*. 14: 7-11; 14:22-25. Officer Ramirez testified that Mr. Turner lives in 210 East 102nd Street. *Id*. 15:18-23. She explained that the Defendant and a woman—later identified as Femi Valdez—were yelling and that Defendant was "pushing and shoving" Ms. Valdez and that "when she walked away, he ran after her and he grabbed and pulled her back." *Id*. 16:8-22. She testified that she then "overheard a punching sound" and she "saw Mr. Turner punch the victim multiple times" or "about three times" on the left side of her face with a "closed fist." *Id*. 16:14-17:14. Officer Tolentino also testified that she heard two people yelling and that she watched Defendant punch Ms. Valdez approximately three times with a closed fist about the face. *Id*. 54:17-55:1; 55:6-17. Both Officer Tolentino and Ramirez testified on direct and cross examination that the back of 210 East 102nd was well-lit and that they could see from their vantage point of about 25 to 50 feet away. *Id*. 14:15-16; 18:17-23; 34:24-18; 46:13-22; 54:23-55:17.

Officers Ramirez and Tolentino stated that they began to head toward the back of 210 East 102nd Street, near where the Defendant and Valdez were located. *Id.* 18:24-25:11. Officer Ramirez explained that because their shift had ended, she and Tolentino were not in uniform and that they were also without their radios or handcuffs. *Id.*16:10-16; 19:1-6; 58:16-58:22. Officer Tolentino then called the on-duty officer providing security at the 23rd precinct, Officer Kumar, for backup. *Id.* 16:10-16; 19:1-6; 57:24-58:10. Officer Tolentino told Officer Kumar "to go over the air on the radio and say where we at so other officers can come and assist." *Id.* 58:11-22.

At around the same time, Officer Araliz Martemoya, who had also just ended her shift, crossed over Third Avenue toward Officers Ramirez and Tolentino to see what was happening. *Id.* at 21:13-23. Officer Martemoya joined the other officers and Officer Ramirez explained to her that they had observed an assault. *Id*; *id.* 76:5-7.

4

Officer Martemoya also testified. On cross-examination, Officer Martemoya testified that she did not personally see Mr. Turner punch Ms. Valdez. *Id*. 85:8-14; 87:16-22. Officer Martemoya was confronted with a prior inconsistent statement within a state criminal court complaint which stated "I'm informed by Police Officer Araliz Martemoya, Shield No. 10729, that she observed the defendant strike Femi Valdez in and about the face with a closed fist." *Id*. 89:10-24. When asked if she told Officer Kumar that she observed the Defendant strike Ms. Valdez in the face with a closed fist, she testified that she didn't recall saying that and that she did not write that statement. *Id*. 89: 20-24.

Officer Ramirez explained that as she and the other officers approached 210 East 102nd Street, the Defendant and Valdez were headed toward the back entrance of the building. *Id.* 22:6-13. Officers Ramirez, Tolentino, and Martemoya all testified that they saw Defendant push Ms. Valdez toward the back door of the building. *Id.* 22:20-23:6; 57:17-21; 60:10-12; 61:8-13; 63:1-4; 81:15-21. Officer Ramirez testified she was worried for Ms. Valdez's safety and ran as the Defendant pushed Ms. Valdez into the building. *Id*. 23:1-6. Officer Ramirez entered the back entrance of 210 East 102nd Street, saw that "Mr. Turner was still holding onto the victim and pulling her," grabbed Officer Kumar's handcuffs and placed Defendant under arrest. *Id*. 23:7-13; 82:6-9. Officers Ramirez, Tolentino, and Martemoya testified that they observed redness or swelling in Ms. Valdez's face. *Id*. 30:8-9; 64:6-8; 83:5-9; 90:10-12. Officer Tolentino testified that she did not see "visible injuries," but her face had "a little swelling." *Id*. 64:6-8.

### 2. Testimony of Defense Witness Femi Valdez

The Defendant called Ms. Femi Valdez as a witness at the Hearing. Officers Ramirez, Tolentino, and Martemoya testified that Femi Valdez was the victim punched and pushed by Defendant on August 28, 2022. Ms. Valdez testified that that she and Mr. Turner had attended a

barbecue with friends and family earlier that evening. ECF No. 37, Transcript of December 14, 2022 Hearing ("Tr. Day 2") 7:14–19. Ms. Valdez stated that she had been drinking and that she was intoxicated. *Id.* 8:7–12. She stated that on a "scale of one through ten," she was a "seven" in terms of intoxication, but that she was not "belligerent" and she "knew what [she] was doing." *Id.* 8:11-8:12; 24:21-25:2. She explained that she and Mr. Turner ended up behind his building at 210 East 102nd St. where, awaiting a taxi, they engaged in an argument where Mr. Turner told her that she should stop drinking and that they should not continue partying, as she wished to do. *Id.* 10:13–11:4. Ms. Valdez testified that, as their discussion turned more heated, Mr. Turner "smacked the bottle out of [her] hand," which she then picked back up. *Id.* 11:2–4, 12:5–14. Ms. Valdez explained that when the Defendant was arrested, she told the police officers that the Defendant "didn't do anything to [her]." *Id.* 15:13-21; *see also* GX-5 at 6:30-6:58.[2]

Ms. Valdez testified the Defendant never pulled, dragged, or pushed her into the building. *Id.* 12:19-13:16. She also testified that the Defendant never slapped or punched her. *Id.* After Mr. Turner was arrested, Ms. Valdez explained that she went to the 23rd Precinct where NYPD officers took pictures of her face and body and that she had no injuries. *Id.* 17:14-18:17.

On cross-examination, Ms. Valdez initially disputed the characterization of her discussion with the Defendant as an "argument." *Id.* 25:19-24. Ms. Valdez later accepted this characterization and agreed that she and the Defendant were "loud speaking" and "arguing." *Id.* 28:20-24. On cross-examination, the Government confronted the Ms. Valdez with the Defendant's statement on the night of the arrest that he "was just pushing her to the door." *Id.* 30:22-31:31:17; *see also* DX-K[3] at 1:30-1:35. Ms. Valdez testified that she did not hear the Defendant say this. *Id.* 31:9-17.

---

[2] GX refers to the Government's Hearing Exhibits.
[3] DX refers to the Defendant's Hearing Exhibits.

During cross-examination, Ms. Valdez also testified that she is pregnant with the Defendant's baby and that she would like for the Defendant to be present for the birth and to be in their child's life. *Id*., 20:18-22:4. She also explained that she does not want Mr. Turner to go to prison "for something he didn't do," *id*. 22:5-14, and that she knows that that Mr. Turner could go to prison if he violates the terms of his supervised release. *Id*. 22:22-24:16.

### 3. Body Camera Footage of August 28, 2022

Government Exhibit 5 depicts NYPD Officer Kumar's body camera footage from the scene of the incident on August 28th, spanning approximately 3:19 a.m. until 3:30 a.m. Defense Exhibit K also depicts NYPD body camera footage, from another NYPD officer, of the scene of the August 28th incident, spanning approximately from 3:21 am until 3:31 a.m. GX-5 depicts Officer Ramirez arresting the Defendant on August 28, 2022. In this body camera footage, Officer Tolentino states that the Defendant "punched her so many times" and that she "saw him." GX-5 at 3:54. Defense Exhibit K demonstrates Ms. Valdez explaining to NYPD officers that the Defendant had only hit the bottle out of her hand and that he did not touch her. DX-K at 7:30-7:51. Mr. Turner also states in this body camera footage, "I was just pushing her to the door." DX-K at 1:30-1:35.

### 4. Photographs of Femi Valdez

Defense Exhibits H1, H2, H3, H4, H5, and H6 depict photographs of Ms. Valdez's face and arms that were taken at the 23rd Precinct following the Defendant's arrest. Tr. Day 1, 41:6-10. On cross-examination, Officer Ramirez viewed these exhibits and testified that she did not observe any bruising on Ms. Valdez's arms. *Id*. 42:3-14. Officer Ramirez indicated that there was redness on her cheek and near her mouth and chin area. *Id*. 21:12-42:1. On cross-examination, Officer Martemoya testified that she did not see redness in the photographs of Ms. Valdez. *Id*.

90:20-91:2. Ms. Valdez testified that they were accurate photographs of the night of the arrest and

that the photographs did not show injuries or anything unusual on her face. Tr. Day 2, 17:17-18:17.

**B. Shooting Incident**

**1. Testimony of NYPD Officer Loyda Mercado**

The Government's final witness was NYPD officer Loyda Mercado of the 23rd Precinct.

Officer Mercado testified that at approximately 9:00 a.m. on September 10, 2022, she was working

at the 23rd Precinct, across the street from the Washington Houses, when she heard three gunshots.

Tr. Day 1, 103:10-104:9. She explained that she responded to the scene, began speaking with

responding officers, and canvassed the area for shell casings. *Id.* 104:15-21. Officer Mercado

testified that she canvassed the neighborhood for surveillance video. *Id.* 105:1-13. She stated that

she collected and viewed surveillance video from local establishments that showed two individuals

in and around Emerson Deli, located at the corner of East 101 Street and Third Avenue, shortly

before the shooting. *Id.* 105:6-18; 106:16-21. One of the individuals was Sincere Vanterpool,

whom Officer Mercado understood to be a member of the Wuski gang of the East River Houses.

*Id.* 105:19-25. Officer Mercado testified that she found this odd because the Emerson Deli is in

the territory of the Broad Day Shooters of the Washington Houses, a rival gang of the Wuskis. *Id.*

106:6-15. Officer Mercado explained that Vanterpool was a suspect early in the investigation. *Id.*

107:12-16; 147:1-3. Officer Mercado also testified that she understands Mr. Turner to be a member

of the Broad Day Shooters. *Id*. 101:13-102:18.

Officer Mercado testified that she learned from a responding officer that a witness had

witnessed the shooting on September 10, 2022. *Id*. 108:5-9. Witness-1 provided a statement to

responding officers that was captured on body camera footage. *Id.* 108:5-11; *see also* DX-B. The

Government played the body camera footage during Officer Mercado's testimony. Officer

Mercado reviewed the relevant body camera footage and testified that Witness-1 stated that the shooter wore a black jacket, dark-colored pants and that he ran inside of 210 East 102nd Street. *Id*. 108:14-109:1. On cross-examination, Officer Mercado testified that Witness-1's description in the body camera footage was "a black guy, skinny, black hoodie and black pants." *Id*. 141:5-20. Officer Mercado explained that she contacted Witness-1 on September 22, 2022 over the phone and that Witness-1 told Officer Mercado that she was standing at East 101st Street and Third Avenue in the pathway near Washington House, when a Black male ran past her, shot at two other individuals "who were a little further ahead in the pathway" and then ran into the building at 210 East 102nd Street. *Id*. 109:2-13; 113:1-4. Officer Mercado testified that during this September 22nd call, Witness-1 added more details to the shooter's description—this time Witness-1 said the shooter was wearing a black hoodie, dark-colored pants, and colorful underwear. *Id*. 109.

After speaking with Witness-1 on September 22, 2022, Officer Mercado explained that she reviewed surveillance video of the rear entrance to 210 East 102nd Street from the morning of September 10, 2022. *Id*. 114:16-115:11. However, on cross-examination, Officer Mercado testified that she pulled and watched this surveillance video on September 19, 2022. *Id*. 172:4-10. The video depicts an individual running into the back of 210 East 102nd Street at approximately 8:52 a.m. *Id.* 116:1-9; GX-6. The individual in the video is wearing a black hoodie with white lettering and white drawstrings, dark-colored jeans, blue and red underwear, and white and blue sneakers. *Id.* 116:12-117:19. After reviewing a still photograph of the surveillance video, Officer Mercado testified that the white lettering on the sweatshirt read "Hope." *Id.* 118:18-21; GX-8. No other individual can be seen on surveillance video running into the back of 210 East 102nd Street on the morning of September 10, 2022. *Id.* 117:20-118:13; 119:7-120:5.

Officer Mercado then testified that she spoke with Witness-1 again on the phone on September 27, 2022 and asked her if she could go to Witness-1 and show her a video. Tr. Day 1 120:8-121:10. Officer Mercado explained that Witness-1 said yes and then Officer Mercado met with Witness-1 in person and showed her a clip of the surveillance video depicted in GX-6. *Id*. 121:14-22. Officer Mercado testified that as Witness-1 watched the video, she pointed to the individual running and said, "that's the guy." *Id*.

Officer Mercado also testified that she reviewed social media video and surveillance video from the evening of September 9, 2022 that showed the Defendant wearing the same clothes as the individual believed to be the September 10th shooter. *Id*. 122:7-22; GX-11. Officer Mercado explained that she reviewed an Instagram story of the "SoLoudFred" account, which belongs to Fernando Rios—an associate of the defendant. *Id*. 122:7-22; GX-11. The Instagram story shows multiple individuals at an outdoor party near the Washington Houses the night before the shooting. *See* GX-11. One of the individuals is wearing the same clothes as the individual who ran into the back of 210 East 102nd Street on the morning of September 10, including a black hoodie with white lettering, dark-colored jeans, colorful underwear, and white sneakers. Tr. Day 1 123:16-22; GX-11. Officer Mercado recognized the individual in the Instagram video to be the Defendant, whom she knows from her policing work around the Washington Houses. *Id*. 124:1-7; 101:13-103:5.

Officer Mercado further testified that she reviewed NYCHA surveillance video from the evening of September 9, 2022, depicting the same outdoor party as seen in the SoLoudFred Instagram video. *Id*. 125:4-8; GX-12. Officer Mercado again testified that she recognized the individual seen in the NYCHA surveillance video wearing a black hoodie and dark-colored pants to be the defendant. *Id*. 126:3-22. Additionally, Officer Mercado reviewed images from the

Defendant's Instagram account, called "youngboyday" and she testified that the account included multiples images of the Defendant wearing the same clothes worn by the alleged September 10th shooter. *Id.* 126:23-132:9; GX-15; GX-16, GX-17; GX-22; GX-24. Officer Mercado explained that on the basis of these images and other information gathered in her investigation, she concluded that the Defendant is the shooter from September 10, 2022. *Id.* 132:10-12.

### 2. Body Camera Footage of September 10, 2022.

Defense Exhibit B depicts NYPD body camera footage from the scene of the incident on September 10, 2022, spanning from approximately 8:54 a.m. to 9:07 a.m. DX-B depicts Witness-1 speaking to responding officers in Spanish after the shooting and a separate person translating for her. DX-B at 1:00–3:00.

### 3. Video Surveillance

Government Exhibit 6 depicts surveillance video from the rear of 210 East 102nd Street on the morning of September 10th. The video depicts an individual running into the back of 210 East 102nd Street at approximately 8:52 a.m. GX-6. No other individual can be seen on surveillance video running into the back of 210 East 102nd Street on the morning of September 10, 2022. *Id.*

Government Exhibit 12 depicts NYCHA surveillance video on the evening of September 9, 2022. The video depicts a party at 210 East 102nd Street.

Defense Exhibit C depicts surveillance video from inside Emerson Deli on the morning of September 10, 2022, at approximately 8:44 a.m. Emerson Deli is located across Third Avenue from the Washington Houses. The video shows two individuals, including Sincere Vanderpool who is wearing a black hoodie and dark colored pants, and an individual named Bubacar Touray. Defense Exhibit G depicts surveillance video from a vape shop that looks out to Third Avenue on the morning of September 10, 2022, immediately prior to the shooting. The video depicts Mr. Turner walking toward a double-parked car and then later the footage shows Touray standing at

the establishment door and pointing towards the double-parked car. Minutes later Vanterpool leaves the vape shop and walks toward the double-parked car. Defense Exhibit D depicts surveillance video from Cherry Valley Marketplace located at the corner of Second Avenue and 101st Street on September 10th at approximately 8:53 a.m. The video depicts Mr. Vanterpool and Mr. Touray walking towards the East River Houses. Tr. Day 1, 160:25-162:12.

### 4. Government Exhibits 11, 15, 16, 17, 18, 22, 24 (Social Media Posts)

Government Exhibit 11 depicts a screen recording of an Instagram story of the "SoLoudFred" account, which belongs to Fernando Rios, whom Officer Mercado testified is an associate of the defendant. *Id*. 122:7-22. The Instagram story shows multiple individuals at an outdoor party near the Washington Houses the night before the shooting. *See* GX-11. Government Exhibits 15, 16, 17, 18, 22, and 24 all depict the Instagram account of "youngboyday" and images from this account. The Instagram account belongs to the Defendant.

## LEGAL STANDARD

### I.      Revocation of Supervised Release

"A district court may revoke supervised release and impose a term of imprisonment if the court finds by a preponderance of the evidence that the defendant violated a condition of supervised release." *United States v. Peguero*, 34 F.4th 143, 152 (2d Cir. 2022); 18 U.S.C. § 3853(e)(3). The Government bears the burden to prove by a preponderance that the defendant violated a supervised release condition. "The preponderance standard requires proof that the defendant's violation of supervision was more likely than not." *United States v. Edwards*, 834 F.3d 180, 199 (2d Cir. 2016). "[A] district court may find that a defendant has committed another crime even in the absence of a conviction for that crime." *United States v. Glenn*, 744 F.3d 845, 848 (2d Cir. 2014).

## II.     Admissibility of Hearsay Statements

Because revocation hearings are "not deemed part of a criminal prosecution, . . . defendants in such proceedings are not entitled to 'the full panoply of rights' that criminal defendants generally enjoy." *United States v. Carthen*, 681 F.3d 94, 99 (2d Cir. 2012) (quoting *Morrissey v. Brewer*, 408 U.S. 471 (1972))." Neither the Federal Rules of Evidence nor the Sixth Amendment's Confrontation Clause apply with full force in a revocation proceeding." *United States v. Diaz,* 986 F.3d 202, 209 (2d Cir. 2021). The Second Circuit explains that this is because revocation proceedings "must be 'flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial.'" *Id.* (quoting *Morrisey v. Brewer*, 408 U.S. 471, 489 (1972)).

While district courts need not comply with the Federal Rules of Evidence during supervised release revocation proceedings, their findings must be based on "verified facts" and accurate knowledge." *United States v. Bari*, 599 F.3d 176, 178-79 (2d Cir. 2010); *see also United States v. Cancer*, 797 F. App'x 8, 11 (2d Cir. 2019). Additionally, although the Confrontation Clause "'does not apply . . . Federal Rule of Criminal Procedure 32.1 provides that a defendant is entitled 'an opportunity to . . .  question any adverse witness unless the court determines that the interest of justice does not require the witness to appear[.]'" *Peguero*, 34 F.4th at 154 (quoting *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006) and Fed. R. Crim. P. 32.1(b)(2)(c)).

"When a proffered out-of-court statement made by an adverse witness is not within an established hearsay exception, 'Rule 32.1 requires the court to determine whether good cause exists to deny the defendant the opportunity to confront the adverse witness.'" *Diaz*, 986 F.3d at 209 (quoting *Williams*, 443 F.3d at 45.) To determine whether good cause exists to admit hearsay, "the court must balance, on the one hand, the defendant's interest in confronting the declarant,

against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay." *Williams*, 443 F.3d at 45.

## DISCUSSION

### I.       Admissibility of Witness-1 Statements

The Government seeks to admit three out-of-court statements made by Witness-1 on September 10, September 22, and September 27. ECF Nos. 30, 39 at 14. As described above, Witness-1 provided three statements regarding the shooting. (1) On September 10, Witness-1 described the shooter to responding officers as wearing a black jacket, black pants, and running into the back of 210 East 102nd Street after the shooting. (2) On September 22, Witness-1 told Officer Mercado that the shooter ran past her into the Washington Houses complex wearing a black hoodie, dark pants, and colorful underwear, and that he fired at two individuals before running into the back of 210 East 102nd Street. (3) On September 27, Witness-1 said "that's the guy" when Officer Mercado showed the surveillance video of an individual running into the back of 210 East 102nd Street around the time of the shooting.

#### A.  Good Cause

Defendant argues the Court should not admit Witness-1's hearsay statements into evidence because the Government has not established good cause. ECF No. 32. Defendant argues (i) that while Wintess-1 indicated she is concerned about her safety, the Government has failed to identify any legitimate basis for this concern and (ii) that Witness-1's hearsay statements are unreliable.

To determine whether good cause exists to admit hearsay, "the court must balance, on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay." *Williams*, 443 F.3d at 45. The Second Circuit has explained that "a witness does not need to be completely unreachable for there to be good cause for the witness not to testify at a revocation

hearing." *Peguero*, 34 F.4th at 155; *see, e.g., United States v. Harris*, 838 F.3d 98, 107–09 (2d Cir. 2016) (holding that good cause existed to not allow confrontation when a locatable witness refused to testify out of fear of the defendant). Additionally, the Second Circuit has "emphasized that 'good cause justifying the absence of a declarant exists when a defendant has a history of violent conduct that makes reprisal against the declarant a possibility.'" *Peguero*, 34 F.4th at 155 (quoting *Carthen*, 681 F.3d at 101).

The Government explained that it attempted to contact Witness-1 numerous times before finally reaching her by phone on November 16, 2022. Witness-1 repeatedly emphasized that she would not testify as she was concerned about her safety because she worked in the same neighborhood in which the shooting took place and she worried that the Defendant's family members would identify her after seeing her testify. She explained that she would not come to testify even if she received a court-order to do so. ECF No. 30 at 6. When considering the violent nature of the shooting coupled with the Defendant's criminal history[4], the Court finds that the Government's reason for not producing the witness is reasonable. Accordingly, the Court finds that "the [G]overnment's reasons for not producing" Witness-1 to testify at the revocation hearing weigh in favor of accepting the out-of-court statements. *See Williams*, 443 F.3d at 45.

The Court also finds that Witness-1's statements are sufficiently reliable for admission. Witness-1's statements are consistent in the descriptions of the shooter's clothing and that he ran into the rear of 210 East 102nd Street. Additionally, Witness-1's statements are corroborated by surveillance video, which shows an individual matching Witness-1's description running into the rear entrance of 210 East 102nd Street shortly after the shooting. Although Defendant argues that

---

[4] In February 2016, the defendant was convicted of assault in the second degree in violation of N.Y.P.L. § 120.05(2) and in January 2019, he was convicted as a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

Witness-1's description immediately after the shooting was "exceptionally vague" and that her description actually more closely matched with Mr. Vanterpool, Defendant ignores Witness-1's statement that the shooter ran into 210 East 102nd Street. According to the surveillance video presented at the Hearing, the Defendant is the only individual who ran into the rear entrance of the building that morning.

Witness-1 is the only witness who saw the shooting and spoke to law enforcement. Therefore, the Court acknowledges the Defendant's strong interest in confronting this witness. However, the Government's reason for Witness-1's unavailability and the reliability of her statements weigh in favor of their admission. When balanced with the Defendant's interest in confrontation, the Court finds that good cause exists to admit Witness-1's hearsay statements from September 10, 2022 and September 27, 2022.

### B. Identification Procedure

Defendant separately argues that the Court should preclude Witness-1's September 27th statement on the basis that the out-of-court identification procedure used by Officer Mercado was unduly suggestive and Witness-1's identification was unreliable. ECF Nos. 32, 41. For the following reasons, the Court finds that Witness-1's statement is admissible as evidence.

As described above, on September 27, 2022—after Witness-1's statements on September 10 and September 22—Officer Mercado contacted Witness-1, met with her, and showed her the surveillance video of 210 East 102nd Street from the morning of September 10, 2022. Officer Mercado testified she simply played the one-minute video, with no commentary about what it was. Tr. Day 1, 121:14-20. Witness-1 pointed to the individual stating "that's the guy," meaning the individual in the video was the September 10th shooter. *Id*. 121:16-22; 117:22-178:12. Officer Mercado also testified that after speaking with Witness-1 on September 22, 2022, she reviewed

surveillance video of the rear entrance to 210 East 102nd Street from the morning of September 10, 2022. *Id*. 114:16-115:11. However, on cross-examination, Officer Mercado testified that she pulled and watched this surveillance video on September 19, 2022. *Id*. 172:4-10.

Identification procedures where police show a witness a single suspect are typically unduly suggestive. *See Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009) ("a 'showup' procedure is inherently suggestive because it involves the presentation of a single suspect to a witness by the police . . ."). The Second Circuit has "'consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one.'" *Wiggins v. Greiner*, 132 F. App'x 861, 865 (2d Cir. 2005) (quoting *Mysholowsky v. People,* 535 F.2d 194, 197 (2d Cir.1976)). As an initial matter, the Court disagrees with the Government's assertion that Witness-1's September 27, 2022 statement was not the type of "showup" identification that courts view as inherently suggestive.[5] Here, Witness-1 pointed to the only individual depicted in the surveillance video and stated "that's the guy." The Court understands this to be a suggestive showup identification procedure.

However, even if an identification procedure is unduly suggestive, an out-of-court identification is admissible if the record "indicate[s] that the identification is independently reliable." *Brisco*, 565 F.3d at 89 (concluding that showup identification was independently reliable where significant corroborating evidence supported the identification). To evaluate the reliability of an identification, courts consider: "[1] the opportunity of the witness to view the criminal at the

---

[5] The Government cites *Davenport v. City of New York*, No. 15-CV-5890 (MKB), 2017 WL 4356883 (E.D.N.Y. Sept. 28, 2017) where the victim viewed a surveillance video of the events depicting the alleged crime prior to identifying the person shown in the video in a subsequent photo array. The Court reasoned that "[t]he complainant viewed the video as part of the investigation into the events of which she was a victim rather than for the purpose of making an identification . . . ." *Id.* at *9. Here, however, the identification of the Defendant occurred when she viewed the surveillance video; there was no subsequent photo array or identification procedure.

time of the crime, [2] the witness's degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Id.*

The record demonstrates that Witness-1's out-of-court identification was reliable. As explained previously, the Witness-1's September 10 and September 22 statements are consistent and are corroborated by surveillance video. Furthermore, Witness-1 had a clear opportunity to view the crime, she did not express any uncertainty about what she saw or her ability to perceive what happened, and she spoke with responding officers moments after the shooting took place.

Defendant additionally attempts to argue that Officer Mercado had identified and was focused on Mr. Turner as the likely perpetrator before she ever spoke with Witness-1. ECF No. 40 at 10. Therefore, the Defendant argues, it is quite possible that on September 22, Officer Mercado "actually suggested" new details about the shooter's clothing to Witness-1, and that the identification procedure on September 27 was tainted by Officer Mercado's prior determination. Defendant points to Officer Mercado's admission on cross-examination that she pulled and viewed the surveillance video depicted in GX-6 on September 19, Tr. Day 1, 170-171, prior to speaking with Witness-1 and that she requested an investigation card for Mr. Turner on September 20. *Id.*

These arguments are also unavailing. Although Witness-1's second statement included additional details, it was consistent with the first statement and Witness-1 reiterated that the shooter ran into 210 East 102nd Street. Additionally, Defendant's assertion that Officer Mercado herself suggested new details to the Witness is contradicted by Officer Mercado's testimony. Finally, Officer Mercado testified that although she may have had a "suspicion," *id.* 175, that the individual in the surveillance video was Mr. Turner, she was not certain. In any event, Officer Mercado did

not relay any suspicions to Witness-1; she simply showed her the surveillance video. The Court admits the September 27 statement into evidence.

Even if the Court were to exclude Witness-1's September 27 identification, Witness-1's prior statements on September 10 and September 22, coupled with the fact that the Defendant is the only person who ran into the back of 210 East 102nd Street at the time of the shooting incident, are enough for the Court to conclude that the Defendant was the shooter on September 10, 2022. Therefore, regardless of the Court's admission of the September 27 statement, the Government has met its burden as to Specifications 4, 6, and 8.

## II.     Specifications 1-3

Specifications 1-3 allege that on or about August 28, 2022, shortly after 3:00 a.m., the defendant pushed and struck a female victim in or around the face, in violation of New York Penal Law §§ 240.30(04), 110-120.00(01), and 240.26(01).

### A.  Specification 1

To prove Specification 1, the Government must show, by a preponderance of the evidence, *see* 18 U.S.C. § 3583(e)(3), that the defendant violated New York Penal Law § 240.30(04), aggravated harassment in the second degree. A person is guilty of aggravated harassment in the second degree when, as relevant here, "with the intent to harass, annoy, threaten or alarm another person, he or she strikes, shoves, kicks or otherwise subjects another person to physical contact thereby causing physical injury to such person." New York Penal Law § 240.30(04).

The Court finds the evidence insufficient to demonstrate that Defendant has caused a physical injury. Although the responding officers testified that they saw redness or swelling after Defendant's arrest, the photographs presented at the Hearing do not show any injuries on Ms. Valdez's face or body. Additionally, Officer Martemoya testified that she did not see redness in

19

the photographs of Ms. Valdez and Officer Tolentino testified she did not see "visible injuries." Therefore, the Government has not met its burden as to Specification 1.

### B. Specification 2

To prove Specification 2, the Government must show, by a preponderance of the evidence, that the defendant violated New York Penal Law § 110-120.00(01), attempted assault in the third degree. The evidence must establish that the defendant intended to cause physical injury to the victim and engaged in conduct that came "dangerously near" to an act which would constitute the crime of assault. *See In re Wanji W.*, 716 N.Y.S.2d 676, 676 (2d Dept. 2000); *see also People v. Tracy*, 867 N.Y.S.2d 19 (App. Term 2008) ("[A] person is guilty of attempted assault in the third degree when, with intent to cause physical injury, he engages in conduct which tends to cause injury to such person or a third party."); *People v Repanti*, 24 N.Y.3d 706, 710 (2015) ("To be guilty of attempted assault in the third degree requires proof that defendant engage[d] in conduct which tends to effect the commission of [assault], with the intent to cause physical injury to another").

The Court finds that the evidence clearly demonstrates that the Defendant attempted to assault Ms. Valdez. Two off-duty officers both credibly testified that the Defendant and Ms. Valdez were loudly arguing, and that Defendant punched Ms. Valdez, and three officers testified that they witnessed Defendant forcibly push Ms. Valdez. The Defendant also admitted that he "was just pushing her to the door." The only question is whether there is sufficient evidence of intent to cause physical injury. Intent may be inferred from the natural and probable consequences of a defendant's conduct. *United States v. Mojica*, No. 19-CR-280 (RA), 2021 WL 982458, at *11 (S.D.N.Y. Mar. 16, 2021), *aff'd*, No. 21-965-CR, 2022 WL 1132223 (2d Cir. Apr. 18, 2022) (citing *People v. Roman,* 787 N.Y.S.2d 568 (4th Dep't 2004), *lv. denied*, 4 N.Y.3d 802). That Defendant

punched and pushed the victim leads the Court to a finding of intent. *See, e.g.*, *Tracy*, 867 N.Y.S.2d at 19 (evidence sufficient to establish attempted assault in third degree where defendant hit victim in face with pocketbook, punched her repeatedly in the arm, and threw her to the ground). Therefore, the Government has met its burden as to Specification 2.

### C.  Specification 3

To prove Specification 3, the Government must show, by a preponderance of the evidence, that the defendant violated New York Penal Law § 240.26(01), harassment in the second degree. A person is guilty of harassment in the second degree when, "with intent to harass, annoy or alarm another person," he or she (1) "strikes, shoves, kicks, or otherwise subjects such other person to physical contact, or attempts or threatens to do the same." New York Penal Law § 240.26(01).

The Court finds that Defendant's conduct in punching and pushing Ms. Valdez satisfies the conduct element of the crime, leaving only the question as to whether Defendant acted with the required intent. It is undisputed that the Defendant and Ms. Valdez were loudly arguing, and that the Defendant was yelling at Ms. Valdez to stop drinking. Additionally, Officer Ramirez testified that Defendant was "pushing and shoving" Ms. Valdez and that "when she walked away, he ran after her and he grabbed and pulled her back." Tr. Day 1, 16:8-22. This is consistent with an intent to harass or annoy her. The Court does not credit Ms. Valdez's testimony that the defendant, in an attempt to control her decision-making, keeping her from continuing to drink and party, "merely" smacked a drink out her hand.  The Government has met its burden as to Specification 3.

### III.    Specifications 4-6, & 8

Specifications 4-6 allege that the defendant used a firearm to shoot at victims on the morning of September 10, 2022, in violation of New York Penal Law §§ 125.25(01); 120.25; and

265.01(01). Specification 8 charging the defendant with possessing a firearm in violation of his supervised release conditions also stems from the alleged September 10, 2022 incident.

### A. Specification 4

To prove Specification 4, the Government must show, by a preponderance of the evidence, that the defendant violated New York Penal Law § 125.25(01), attempted murder. In New York, "[t]he crime of attempted second degree murder is committed when, with the intent to cause the death of another person, one engages in conduct which tends to effect commission of that crime." *People v. Fernandez*, 88 N.Y.2d 777, 783 (1996).

There is no dispute that on the morning of September 10, 2022, an individual fired multiple shots from a firearm in the vicinity of the Washington Houses. Tr. Day 1, 109:8-114:15. The testimony and exhibits admitted into evidence at the Hearing established the following facts. The shooter fired three shots at two individuals from close proximity. *Id.*; *id.* 104:8-9. After firing, the shooter turned left and ran into the back of 210 East 102nd Street. *Id.* 109:8-114:15. Surveillance video and Officer Mercado's investigation establishes Mr. Turner to be the individual seen running into the back of 210 East 102nd Street shortly after the shooting. The Court finds Officer Mercado's testimony to be credible and the Court credits Witness-1's out-of-court statements to be reliable as well. Therefore, the Court finds that Mr. Turner shot at two individuals on September 10, 2022 outside 210 East 102nd Street. This satisfies the conduct element of the crime, leaving only the question as to whether Defendant acted with the required intent.

Use of a gun alone does not establish intent for purposes of attempted murder, but "only a minimum additional showing of intent is necessary." *United States v. Muyet*, 994 F. Supp. 501, 518 (S.D.N.Y. 1998). Intent to kill can be inferred where a defendant shoots at a target multiple times, or shoots at a target from close range. *See People v. Nance*, 572 N.Y.S.2d 335, 336 (2d

Dept. 1991) ("The defendant's intent to cause death is manifest by his act of repeatedly shooting the victim at close range"); *People v. Harper*, 17 N.Y.S.3d 797, 800 (4th Dept. 2015) ("criminal intent was readily inferable from [defendant's] conduct" in firing multiple shots at victim) (internal quotation marks omitted); *People v. Gonzalez*, 628 N.Y.S.2d 726, 727 (2d Dept. 1995) ("intent was established by the defendant's overt acts of pulling out his gun, turning it towards the officer, and firing it at least twice"). The evidence demonstrates that Mr. Turner fired three shots at Mr. Vanterpool and Mr. Touray at a close distance. Tr. Day 1, 109:9-13. This leads the Court to a finding of intent. Because the government has shown all the elements by a preponderance of the evidence, the Court finds that Defendant has committed the violation charged in Specification 4.

### B.  Specification 5

To prove Specification 5, the Government must show, by a preponderance of the evidence, that the defendant violated New York Penal Law § 120.25, reckless endangerment in the first degree. A person is guilty of reckless endangerment in the first degree if, "under circumstances evincing a depraved indifference to human life," he or she "recklessly engages in conduct which creates a grave risk of death to another person." New York Penal Law § 120.25.

Defendant argues that the mental states required for Specifications 4 (attempted murder) and 5 (reckless endangerment) are mutually exclusive because under New York law reckless endangerment requires that the defendant created a grave risk of death to a person other than their target. *See United States v. Crocker*, No. 13 Cr. 414 (SHS), 2021 WL 6051083, at *4-6 (S.D.N.Y. Dec. 20, 2021). The Government responds that the evidence demonstrates at least that Defendant intended to kill Mr. Vanterpool and that the Defendant created a grave risk of Mr. Touray's death by firing in his direction. ECF No. 41 at 7-8.

The Court first considers the element that Defendant created a "grave risk of death to another person." "New York law holds that 'grave risk of death to another person' means endangerment of someone other than a defendant's target." *Crocker*, 2021 WL 6051083, at *5 (citing *People v. Scott*, 894 N.Y.S.2d 532, 533-34 (2010)). Although the Government asserts that the Defendant shot into the courtyard of a "busy housing complex," the Government has not presented evidence that any individual was at "grave risk of death" apart from the two individuals—Mr. Vanterpool and Mr. Touray—that the Government argues were targeted by the Defendant on September 10, 2022. Therefore, the Court cannot find there was a "grave risk of death to another person" necessary for element one of N.Y. Penal Law § 120.25. *See Scott,* 894 N.Y.S.2d at 533-534 (finding the prosecution failed to prove the defendant's conduct created a grave risk of death to another person after the prosecution presented no evidence that any person other than the intended victim was in or near the line of fire). Accordingly, the Government has not met its burden of showing element one of this crime by a preponderance of evidence and therefore the Government has not met its burden as to Specification 5.

**C.  Specification 6**

To prove Specification 6, the Government must show, by a preponderance of the evidence, that the defendant violated New York Penal Law § 265.01(01), criminal possession of a weapon in the fourth degree. A person is guilty of criminal possession of a weapon in the fourth degree when he or she "possesses any firearm, electronic dart gun, electronic stun gun, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or 'Kung Fu star.'" New York Penal Law § 265.01(01). The Court has already found that Mr. Turner intentionally discharged a firearm on September 10, 2022 in the direction of two

individuals. Therefore, the Court finds that the Defendant has committed the violation charged in Specification 6.

### D.  Specification 8

To prove Specification 8, the Government must show, by a preponderance of the evidence, that the defendant possessed a firearm in violation of a mandatory condition of his supervised release. Based on the evidence and testimony presented at the Hearing, the Court finds the Government has met its burden as to Specification 8.

### CONCLUSION

The Court adjudges Mr. Turner to be guilty of violating Specifications 2, 3, 4, 6, and 8 in the Violation Report and not guilty of Specifications 1 and 5.

Sentencing on the violations is scheduled for **February 23, 2023 at 3:30 p.m**. The status conference set for February 1, 2023 at 11:00 a.m. is hereby adjourned. Defendant shall submit any sentencing materials by no later than **February 15, 2023**. The Government shall submit its submissions by **February 21, 2023**

**SO ORDERED.**

Dated:    **January 31, 2023**
           **New York, New York**

_____
    **ANDREW L. CARTER, JR.**
    **United States District Judge**